IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

**DAMON DEWAYNE PORTER**                                                    **PLAINTIFF**

**v.**                                    **Case No. 2:19-CV-00138-LPR**

**DEWAYNE HENDRIX, et al.**                                          **DEFENDANTS**

## MEMORANDUM OF DECISION

On June 6, 2023, the Court presided over a bench trial in this case.[1]  The trial involved only one claim under the Federal Tort Claims Act. That single claim alleged that (1) the United States negligently failed to repair a hole in a prison shower, (2) Plaintiff Damon Dewayne Porter stepped in the hole and fell, and (3) Mr. Porter suffered injuries from the fall.[2]  At the bench trial, the Court heard evidence and legal argument.  Now, in accordance with Federal Rule of Civil Procedure 52(a), and after reviewing the entire trial record, the Court makes the following findings of fact and conclusions of law regarding Mr. Porter's claim.

### FINDINGS OF FACT

1.      During the time period involved in this lawsuit, Mr. Porter was an inmate at the Federal Correctional Institution in Forrest City, Arkansas (Forrest City).[3]  He was serving a 151-month sentence for enticement to prostitution.[4]

2.      Mr. Porter was originally incarcerated at Beaumont Medium.[5]  But sometime in

---

[1] Clerk's Mins. (Doc. 68).

[2] Compl. (Doc. 2) at 9, 12–13.  All other claims in this case have either been dismissed or stayed pending resolution of the FTCA slip-and-fall claim.  *See* Order (Doc. 37); Order (Doc. 39).

[3] June 6, 2023 Tr. of Bench Trial at 8:21–23, 38:9–10.

[4] *Id.* at 8:24–9:2, 38:1–6.

[5] *Id.* at 9:3–4, 38:7–8.

2015 or 2016, he was sent to Forrest City Medium.[6]

3.      At Forrest City, Mr. Porter was housed in the A-1 Unit.[7]  He was in cell 220.[8]  The

following picture shows Mr. Porter's cell in relation to the showers and much of the A-1 Unit.[9]

Cell 220 is in the foreground of the picture, on the left side as one looks at the picture.  The two

rows of showers—one row above the other row—are in the background of the picture, on the right

side as one looks at the picture.



4.      The A-1 Unit has twelve showers.[10]  Showers one through six are on the first floor

and showers seven through twelve are directly above on the second floor.[11]  Generally speaking,

inmates may use any of these showers; the decision of which shower to use is left to the individual

---

[6] *Id.* at 9:5–9, 38:9–18.  Neither the testimony in this trial nor any admitted exhibit provides a more exact transfer date.

[7] *Id.* at 10:19–20.

[8] *Id.* at 11:4–5.

[9] Def.'s Trial Ex. 2B; *see* June 6, 2023 Tr. of Bench Trial at 11:1–5.

[10] June 6, 2023 Tr. of Bench Trial at 57:25–58:2; *see* Def.'s Trial Ex. 2A.

[11] June 6, 2023 Tr. of Bench Trial at 58:19–24; *see* Def.'s Trial Ex. 2A.

inmate.[12]

5.      The following picture shows more clearly the two rows of showers.[13]  Shower 8, which is the shower directly at issue in this case, is on the top row, second-from-the-left as one looks at the picture.[14]



6.      On October 25, 2018, Mr. Porter took a shower in Shower 8.[15]  There was a hole in the floor of Shower 8 as the result of water eroding away the tile.[16]  The hole was about five to eight inches wide.[17]  The deepest part of the hole was "approximately an inch and a half to [two] inches deep."[18]  It was located about ten inches from the back wall of the shower, almost directly

---

[12] *See* June 6, 2023 Tr. of Bench Trial at 43:12–15.

[13] Def.'s Trial Ex. 2A; *see* June 6, 2023 Tr. of Bench Trial at 11:22–12:13, 58:3–8.

[14] June 6, 2023 Tr. of Bench Trial at 12:14–23, 58:9–11.

[15] *Id.* at 10:15–18, 75:1–7.

[16] *Id.* at 59:11–14, 59:21–60:5, 62:16–19; *see* Def.'s Trial Ex. 2C.

[17] June 6, 2023 Tr. of Bench Trial at 59:21–60:5.

[18] *Id.*

below the shower head.[19]

7.      Below are two pictures to aid in understanding the contours of the shower and the location of the hole.  The first picture is an image of the shower taken in 2022, well after the hole was fixed.[20]  That picture was taken from essentially the entrance to the shower, and shows the shower head, two drains, and no hole.  The second picture is of the eroded tile and resulting hole in Shower 8 as it was on October 25, 2018.[21]  That picture shows the drain closest to the shower head and the hole between the drain and the wall to which the shower head is attached.



---

[19] *Id.*

[20] Def.'s Trial Ex. 2F.

[21] Def.'s Trial Ex. 2C.



8.      The hole was there ever since Mr. Porter arrived at Forrest City in 2015 or 2016.[22] Mr. Porter knew about the hole for years.[23]  And he knew it was getting worse, bigger, and deeper over time.[24]  Indeed, he had made efforts to report the hole to Forrest City staff prior to October 25, 2018.[25]  Despite the existence of the hole and Mr. Porter's knowledge of it, Mr. Porter chose to use Shower 8 almost exclusively from his arrival at Forrest City through October 25, 2018.[26] Mr. Porter does not suggest he forgot about the hole when he chose to use Shower 8 on October 25, 2018.  The Court finds that, on October 25, 2018, before he entered Shower 8, Mr. Porter knew about the hole, its general size, and its general depth.

9.      Mr. Porter was not the only one to know about the hole.  Bureau of Prisons officials

---

[22] June 6, 2023 Tr. of Bench Trial at 16:16–19, 39:3–5.

[23] *Id.*; *see id.* at 38:25–39:2.

[24] *Id.* at 16:16–19, 39:3–5.

[25] *Id.* at 16:20–22.

[26] *Id.* at 12:14–15.

knew about the hole as well.[27]  They knew about it and the need to fix it at least as far back as August of 2018.[28]  And the reasonable inference the Court draws is that BOP officials knew about it long before August of 2018, especially since officials came around and did safety inspections at regular intervals.[29]

10.     While showering in Shower 8 on October 25, 2018, Mr. Porter got soap in his eyes, inadvertently stepped into the hole, and fell to the ground.[30]  The fall caused him some pain and resulted in some level of injury.[31]

11.     All of the foregoing is either undisputed or only minimally disputed.  The serious factual dispute (at least with respect to liability) is whether, on October 25, 2018, Shower 8 was the only shower in the A-1 Unit with hot water.

12.     Mr. Porter testified that he usually used Shower 8 because it was the only shower with hot water.[32]  This portion of Mr. Porter's testimony was focused generally on his entire term of incarceration at Forrest City up until the day of the incident.[33]  As to the day of the incident, Mr. Porter also specifically testified that Shower 8 was the only shower in the A-1 Unit that had hot water.[34]

13.     The Court credits the testimony discussed in paragraph 12 in part.  To be clear, the Court finds that Mr. Porter sincerely believed, both before and on October 25, 2018, that Shower

---

[27] McGlawn Dep. at 20:7–22:3; Pl.'s Trial Ex. 1 at 1–2; Def.'s Trial Ex. 3 at 6; *see* June 6, 2023 Tr. of Bench Trial at 16:20–25, 62:10–15, 63:2–64:1, 64:23–65:1.

[28] Def.'s Trial Ex. 3 at 1, 4, 6.

[29] June 6, 2023 Tr. of Bench Trial at 16:20–17:4; *see id.* at 56:25–57:4, 62:10–13; *see also* Def.'s Trial Exs. 3 & 4.

[30] June 6, 2023 Tr. of Bench Trial at 16:5–9, 17:13–19.

[31] *See infra* Findings of Fact ¶¶ 38–45.

[32] June 6, 2023 Tr. of Bench Trial at 12:14–15, 12:24–25.

[33] *See id.* at 12:25, 42:21–43:6.

[34] *Id.* at 11:6–12:25.

8 was the only shower in the A-1 Unit with hot water.  However, the Court finds that Mr. Porter has failed to prove by a preponderance of the evidence that, in fact, Shower 8 was the only shower in the A-1 Unit with hot water during his incarceration at Forrest City and on October 25, 2018.

14.     The problem with Mr. Porter's testimony is a lack of personal knowledge.  Mr. Porter testified that, when he first came to Forrest City, he used each of the available showers and, at that time, the only shower with hot water was Shower 8.[35]  He also testified that, after this initial period, he used each of the other showers one or two more times before October 25, 2018—the date of his fall in Shower 8.[36]  And he testified that each time he used the other showers, they did not have hot water.[37]

15.     The Court assumes (fairly conservatively based on the testimony) that Mr. Porter was at Forrest City for at least 730 days (2 years) prior to the October 25, 2018 incident.[38]  Over those 730 days, he used each shower other than Shower 8 only two or three times.[39]  With respect to each shower, that's not enough to have personal knowledge that a particular shower was cold all the time or, specifically, on October 25, 2018.  With respect to the showers cumulatively, he only used the 11 showers other than Shower 8 between 22 and 33 times—less than 5 percent of the days between his arrival at Forrest City and the day of his fall.  Again, that's not enough to give him personal knowledge that the other showers were always cold or cold on October 25, 2018.  Moreover, what he had personal knowledge of—in terms of the number of cold showers he had taken—does not make it more likely than not that only Shower 8 had hot water on October 25,

---

[35] *Id.* at 44:7–15.

[36] *Id.* at 44:5–7.

[37] *Id.* at 14:15–22.

[38] *See id.* at 38:11–15 (Mr. Porter stating that he arrived at Forrest City "sometime in '15 or sometime in '16").

[39] *Id.* at 43:16–23.

2018.

16.     Aside from his own personal experience, Mr. Porter testified to seeing, over the course of his time at Forrest City, groups of other inmates running to get in line for Shower 8 as soon as their cell doors were opened.[40]  And he testified that everybody in the A-1 Unit preferred to use Shower 8 because of the hot water.[41]  Specifically, he testified that the only time another inmate would use a shower other than Shower 8 was if the inmate was brand new to the facility or if it was summertime.[42]

17.     There are some problems with this testimony.  First, Mr. Porter does not specify when he saw groups of inmates running to Shower 8.  It is speculative to assume that Mr. Porter was saying this happened every day of his incarceration at Forrest City.  The Court does not make that leap.  Without knowing when this occurred, its evidentiary value is extremely minimal.  Second, we know that Mr. Porter was not always present in the A-1 Unit throughout the day; he often left the unit for work in other parts of the facility.[43]  Although he can testify to what he saw while he was present in the A-1 Unit, he can't testify to what other inmates did or didn't do while he was away from the unit working elsewhere in the facility.

18.     Moreover, there was no competent evidence as to why groups of inmates were running to Shower 8 or not showering in other showers.  To the extent Mr. Porter is relying solely on the fact that other inmates ran to Shower 8 or the fact that he didn't see inmates using the other showers often, it is sheer speculation as to why.  For certain, the Court accepts that this evidence bolsters the idea that Mr. Porter sincerely believed Shower 8 was the only shower with hot water.

---

[40] *Id.* at 13:1–9, 42:25–43:2.

[41] *Id.* at 14:11–13.

[42] *Id.* at 43:2–6.

[43] *Id.* at 15:14–23, 40:4–8.

But Mr. Porter can't testify as to what was in the minds of those other inmates; in any event, those other inmates might have been operating on incorrect assumptions as well.  And if Mr. Porter's testimony was trying to suggest what inmates told him about why they used Shower 8 and not the other showers, that's inadmissible hearsay if used for the truth of the matter asserted.

19.     In a deposition admitted without objection at trial, Martha McGlawn (a Senior Officer Specialist at Forrest City) testified that she vaguely recalled that, at some unspecified time period, inmates would say "there might be hot water on the end showers or in certain spots certain times of the day . . . ."[44]  Even putting aside the hearsay problems with this statement, her vague and unspecific recollections don't come anywhere close to suggesting that Shower 8 was the only one with hot water on October 25, 2018.  Indeed, her testimony about the "end showers," if it could be considered at all, would suggest Shower 8 was not the *only* shower with hot water.[45]  Ultimately, the Court chooses not to consider her hearsay testimony.

20.     On the other side of the ledger, there is some competent evidence that Shower 8 was not the only shower with hot water—both generally and on October 25, 2018.  Ron White, who was the Forrest City Complex Safety Manager from 2016 to 2021, credibly testified that one single pipe services the hot water for all twelve showers in the A-1 Unit.[46]  As Mr. White testified, that means the temperature of the hot water going to each of the twelve showers would be the same at any given time, and so it's the time of use (as opposed to the shower used) that determines whether hot water is available.[47]

21.     In addition, it is worth emphasizing that Shower 8 is the second shower (from the

---

[44] McGlawn Dep. at 9:6–15, 23:15–23.

[45] *Id.*

[46] June 6, 2023 Tr. of Bench Trial at 56:6–15, 61:3–20.

[47] *Id.* at 61:17–62:1, 66:4–13.

left) on the top row.[48]  Given that location, there is no good explanation for why only that shower and no other shower would have hot water.  Perhaps if it was an end shower, it might make more sense.  Or if just Shower 8 and the shower directly below it had hot water, maybe that would make more sense.  But there's no good explanation for why only Shower 8 would have hot water.

22.   Based on the foregoing—especially Paragraphs 13–18 and Paragraph 20—the Court finds that Shower 8 was not the only hot shower in the A-1 Unit on October 25, 2018, but that Mr. Porter sincerely believed it was.  The Court's conclusion is based on its view that Mr. Porter has failed to prove by a preponderance of the evidence that Shower 8 was the only hot shower.[49]

23.   Aside from the hot water issue, the other significant factual dispute in this case centers around the extent of Mr. Porter's injuries from the fall.  The next 43 paragraphs contain factual findings that relate to causation and damages.

24.   Prior to the October 25, 2018 fall, Mr. Porter already had significant injuries and pain associated with some of those injuries.

---

[48] *Id.* at 58:9–11.

[49] Although the Court reached its factual findings on this point independent of the following information, it is worth noting that the Court's findings are consistent with Mr. Porter's Proposed Findings of Fact and Conclusions of Law.  Proposed Fact 2 in that submission reads: "Unit A-1 Shower 8 was one of the only showers that had hot water on October 25, [2018]."  Pl.'s Proposed Findings of Fact and Conclusions of Law (Doc. 72) ¶ 2.  This proposed fact obviously implies that Shower 8 was not the only shower that had hot water on that date.  And lest one believe this was simply a drafting error as opposed to a considered position, the same verbiage appears in other equally important filings.  In Mr. Porter's (pro se) Complaint, he alleged that "[o]n October 25, 2018, inmate Damon Porter . . . entered one of the only hot showers in Unit A-1 upper shower no. 8."  Compl. (Doc. 2) at 23.  In Mr. Porter's Pre-Trial Disclosures, the "concise summary of the facts" section includes the statement that, on October 25, 2018, "Mr. Porter entered one of the only hot showers in Unit A-1 upper shower No. 8."  Pl.'s Pre-Trial Disclosures (Doc. 67) at 2.  In the "[a]ll proposed stipulations" section of that document, Mr. Porter proposed the following stipulation: "Unit A-1 Shower 8 was one of the only showers that had hot water on October 25, [2018]."  *Id.* at 3.  Then, in the "facts and procedural history" section of his Trial Brief, Mr. Porter asserted that "[o]n October 25, 2018, . . . Mr. Porter entered one of the only hot showers in Unit A-1 upper shower No. 8."  Pl.'s Trial Br. (Doc. 73) at 1 (capitalization omitted).  And in the "analysis" section of the same Trial Brief, Mr. Porter argued that he "entered one of the only hot showers in Unit A-1 upper shower No. 8."  *Id.* at 2 (capitalization omitted).  To be fair, these filings were all made before the trial.  However, at the end of trial, the Court asked each party whether they wanted to supplement their proposed findings of fact and conclusions of law based on the evidence that came out at trial.  June 6, 2023 Tr. of Bench Trial at 109:9–17.  Both sides declined the invitation.  *Id.* at 109:18–21.

25.     When he was 15 years old, Mr. Porter was involved in a car wreck.[50]  The wreck "shattered" the left side of Mr. Porter's face and his sinus cavity.[51]  Mr. Porter has sinus problems because of these injuries.  Specifically, he testified to "sometimes" having headaches and being "stopped up."[52]

26.     In 1991, Mr. Porter was shot in the back.[53]  The injury left him with a bullet fragment that "projects over the right lower quadrant" of his lumbar spine.[54]  Since the injury, Mr. Porter has suffered back pain.[55]  After arriving at Forrest City, he visited the medical unit numerous times to address the pain.  A number of those visits occurred before the October 25, 2018 fall. They are detailed below.

27.     On October 26, 2016, Mr. Porter saw Licensed Vocational Nurse Kelsea Jones for a "Bureau of Prisons Health Services Health Screen."[56]  That Health Screen indicated that Mr. Porter had lower back pain from the 1991 gunshot wound.[57]

28.     The Forrest City medical unit performed another health screen of Mr. Porter on March 17, 2017.[58]  That health screen was performed by Registered Nurse Melissa Loveday.[59]

---

[50] June 6, 2023 Tr. of Bench Trial at 9:18–10:4.

[51] *Id.* at 9:21–22.

[52] *Id.* at 10:9–13.

[53] *Id.* at 9:22–23, 10:5–8; Def.'s Trial Ex. 1A at 115–16.  When referencing Defendant's Trial Exhibit 1A, the Court uses the bates-number pagination at the bottom right corner of each exhibit document.  In doing so, the Court omits "BOP" and the leading zeros in the bates-number pagination.  For example, the Court references page "BOP000116" as page "116."

[54] Def.'s Trial Ex. 1A at 171; June 6, 2023 Tr. of Bench Trial at 72:17–22.

[55] June 6, 2023 Tr. of Bench Trial at 10:9–14.

[56] Pl.'s Trial Ex. 2, Attach. 3 at 1.

[57] *Id.* at 3.

[58] Pl.'s Trial Ex. 2, Attach. 4 at 1.

[59] *Id.*

Mr. Porter reported "sciati[c]a" pain at that visit.[60]  The visit was otherwise unremarkable.

29.     On March 22, 2017, Mr. Porter complained to the medical unit about "chronic lower back pain" and "sciatic type pain in [his] hips."[61]  The treating physician at that visit, Dr. Capps, provided Mr. Porter with lower-back exercises and advised him on weight loss.[62]  At the time, Mr. Porter weighed 246 pounds.[63]

30.     On May 24, 2017, Mr. Porter returned to the medical unit to complain about lower back pain that had "increased" to a 6 out of 10.[64]  At that visit, Mr. Porter saw Advanced Practical Registered Nurse Jillian Harris.[65]  Nurse Harris instructed Mr. Porter to use over-the-counter pain medication, muscle rub, and ice.[66]  She also ordered an x-ray of Mr. Porter's lumbar spine.[67]  The results of the x-ray showed the bullet fragment in Mr. Porter's back and "minimal facet arthropathy . . . ."[68]  Minimal facet arthropathy is arthritis, a chronic condition that can cause pain.[69]

31.     After the x-ray, Mr. Porter continued to frequent the Forrest City medical unit for pain treatment.  On June 26, 2017, he complained about back pain that "radiate[d] down his legs" and was an 8 out of 10 on a pain scale.[70]  When asked about his weight loss efforts, Mr. Porter stated that he was doing exercises but not "regularly."[71]

---

[60] *Id.* at 3.

[61] Def.'s Trial Ex. 1A at 115 (capitalization omitted); June 6, 2023 Tr. of Bench Trial at 71:24–72:5.

[62] Def.'s Trial Ex. 1A at 115; June 6, 2023 Tr. of Bench Trial at 71:24–72:6.

[63] Def.'s Trial Ex. 1A at 116; June 6, 2023 Tr. of Bench Trial at 72:7–9.

[64] Def.'s Trial Ex. 1A at 108.

[65] *Id.*; *see* June 6, 2023 Tr. of Bench Trial at 70:19–25.

[66] Def.'s Trial Ex. 1A at 108.

[67] *Id.*

[68] *Id.* at 171; June 6, 2023 Tr. of Bench Trial at 72:23–73:5.

[69] *See* June 6, 2023 Tr. of Bench Trial at 72:23–73:5.

[70] Def.'s Trial Ex. 1A at 104; June 6, 2023 Tr. of Bench Trial at 73:6–9.

[71] Def.'s Trial Ex. 1A at 104.

32.     On July 19, 2017, Mr. Porter reported to the medical unit because of pain in his lower back that he rated as an 8 out of 10.[72]  Nurse Harris prescribed Mr. Porter Motrin, back stretches, muscle rub and ice, and again advised him on diet and weight loss.[73]  On that day, Mr. Porter weighed 242 pounds.[74]

33.     Mr. Porter returned to the medical unit on August 25, 2017.[75]  Dr. Capps treated Mr. Porter and noted that he had chronic lower back pain, that he rated the pain as an 8 out of 10, and that he had not lost any weight since his last visit (although he claimed he walked five miles daily).[76]  At this visit, Mr. Porter weighed 245 pounds.[77]

34.     On December 7, 2017, Mr. Porter returned to the medical unit for continued lower back pain that shot "down his legs and up into his shoulder blades."[78]  Mr. Porter reported that his pain was a 9 out of 10 and became "worse with movement and sitting still for too long."[79]  The medical records indicate that Mr. Porter had gained weight since his previous medical unit visit—he now weighed 254 pounds.[80]  Nurse Harris discontinued the Ibuprofen and prescribed Mr. Porter Indomethacin for pain relief.[81]

35.     On February 6, 2018, Mr. Porter visited the medical unit to complain that the Indomethacin was not relieving his back pain—which he then rated as an 8 out of 10.[82]  He

---

[72] *Id.* at 99.

[73] *Id.*

[74] *Id.* at 100.

[75] *Id.* at 94.

[76] *Id.*

[77] *Id.* at 95.

[78] *Id.* at 82; June 6, 2023 Tr. of Bench Trial at 73:10–21.

[79] Def.'s Trial Ex. 1A at 82; June 6, 2023 Tr. of Bench Trial at 73:17–18.

[80] Def.'s Trial Ex. 1A at 83.

[81] *Id.* at 82.

[82] Pl.'s Trial Ex. 2, Attach. 9 at 1.

indicated that he wished to switch back to Ibuprofen.[83]  Nurse Harris obliged and prescribed Mr. Porter Ibuprofen again.[84]

36.     On May 23, 2018, Mr. Porter went to the Forrest City Medical Center for a CT scan of his lumbar spine.[85]  The results showed "[n]o acute osseous abnormality . . . [and a] small disk osteophyte complex present at the L5-S1 level . . . ."[86]  No acute osseous abnormality means that "there's nothing wrong with the bone."[87]  And a small disk osteophyte complex is "[s]imilar to a bone spur."[88]

37.     On August 8, 2018—about two and a half months before his fall—Mr. Porter again presented to the medical unit with back pain.[89]  He rated his pain as an 8 out of 10 and indicated that "[e]xacerbating [f]actors" were "[w]eather change and prolonged standing."[90]  Mr. Porter saw Dr. Woodard, who renewed Mr. Porter's Ibuprofen prescription.[91]  There is no indication that Dr. Woodard discussed weight loss with Mr. Porter, even though Mr. Porter then weighed 256 pounds.[92]

38.     The October 25, 2018 fall certainly caused Mr. Porter some pain.  When he fell, his "ankle was really throbbing," and he had pain in his shoulder, elbow, neck, and back.[93]  Mr.

---

[83] *Id.*

[84] *Id.* at 3.

[85] Def.'s Trial Ex. 1A at 274.

[86] *Id.*; Pl.'s Trial Ex. 2, Attach. 9; June 6, 2023 Tr. of Bench Trial at 74:5–9.

[87] June 6, 2023 Tr. of Bench Trial at 74:10–12.

[88] *Id.* at 74:13–14.

[89] Def.'s Trial Ex. 1A at 504.

[90] *Id.*

[91] *Id.*

[92] *Id.* at 504–05.

[93] June 6, 2023 Tr. of Bench Trial at 18:10–15; *see id.* at 75:6–9; *see also* Pl.'s Trial Ex. 1 at 1 (Officer McGlawn email stating that "Inmate Porter, Damon . . . fell in shower # 8 . . . and hurt his neck and back . . .").

Porter's pain made him "unable to make it to" the prison medical unit by foot.[94]  So, Registered Nurse Candyce Nichols met Mr. Porter in the A-1 Unit.[95]  Nurse Nichols escorted Mr. Porter to a "medical ambulance" for transport to the medical unit.[96]

      39.    Upon arrival at the medical unit, Mr. Porter was "able to ambulate without assistance [or] limping."[97]  At that point, Mr. Porter reported "aching pain" in the "right side of [his] neck, shoulder, back and leg . . . ."[98]  He also reported "a headache [even] though he did not hit his head."[99]  Mr. Porter rated his pain a 10 out of 10.[100]  Nurse Nichols gave Mr. Porter Tylenol and instructed him to follow-up with medical the next morning.[101]  He was then returned to his cell.[102]

---

[94] Def.'s Trial Ex. 1A at 221; June 6, 2023 Tr. of Bench Trial at 17:16–21, 17:25–18:1.

[95] Def.'s Trial Ex. 1A at 221; *see* June 6, 2023 Tr. of Bench Trial at 17:17–18; *see also id.* at 75:1–5.

[96] Def.'s Trial Ex. 1A at 221; June 6, 2023 Tr. of Bench Trial at 17:17–18:1, 75:10–13.

[97] Def.'s Trial Ex. 1A at 221; June 6, 2023 Tr. of Bench Trial at 75:21–23.  There is conflicting testimony on this point from Mr. Porter.  *See* June 6, 2023 Tr. of Bench Trial at 28:25–29:7 ("[Mr. Porter:]  Like from where I put my wheelchair was probably from right here to the seat right there because you couldn't get it inside the door and I walked like tentatively trying to you might as well say hobble, because it wasn't like walking perfect.").  The Court resolves the conflict in favor of the United States of America.  The Court believes Mr. Porter tended to exaggerate his reports (and testimony) of post-fall injuries and pain.  Indeed, several Forrest City medical professionals created notes that recorded Mr. Porter's ability to walk into the medical unit without the wheelchair.  *See infra* Findings of Fact ¶¶ 43, 55, 58.  These notes were made independent of one another, at different times, and started the night of the fall.  And they are consistent with the Court's finding.  Moreover, also consistent with the Court's finding is the credible testimony that, after his fall, Mr. Porter used the elliptical and sometimes walked laps on the track without a wheelchair.  *See infra* Findings of Fact ¶¶ 47–48.  In short, it is more likely than not that Mr. Porter was able to ambulate without assistance or limping when he arrived at the medical unit after the fall on October 25, 2018.

Throughout the course of the entire Findings of Fact section, the Court either explicitly or implicitly makes findings that require resolution of conflicting evidence (testimonial or otherwise).  Sometimes the Court explicitly notes the conflicting evidence and sometimes it does not.  Regardless, where the Court has made a finding of fact in the face of conflicting evidence, the Court has considered such conflicting evidence before making the finding.  That applies whether the finding is explicit or implicit.

[98] Def.'s Trial Ex. 1A at 221; June 6, 2023 Tr. of Bench Trial at 75:14–18.

[99] Def.'s Trial Ex. 1A at 221; June 6, 2023 Tr. of Bench Trial at 75:14–18.

[100] Def.'s Trial Ex. 1A at 220–21; June 6, 2023 Tr. of Bench Trial at 75:14–18.

[101] Def.'s Trial Ex. 1A at 221; June 6, 2023 Tr. of Bench Trial at 18:19–20.

[102] June 6, 2023 Tr. of Bench Trial at 18:23–25.

40.     About three or four hours later, Mr. Porter was still in pain.[103]  He says his shoulder, ankle, neck, and back were hurting.[104]  At that point, BOP officials decided to take Mr. Porter to an offsite hospital for evaluation—the Forrest City Medical Center Emergency Department (FCMED).[105]

41.     Mr. Porter testified that, at the hospital, he complained of back, neck, shoulder, and ankle pain.[106]  The FCMED documents, however, tell a different story.  They indicate that Mr. Porter complained of head, neck, shoulder, and back pain, but not of ankle pain.[107]  Moreover, while FCMED performed a CAT scan of Mr. Porter's cervical spine, thoracic spine, and lumbar spine,[108] they did not do x-rays, a CAT scan, or any other imaging related to Mr. Porter's ankle.[109]  Given the foregoing, the Court finds that Mr. Porter did not complain of ankle pain at the hospital.

42.     The results of the spinal CAT scan were unremarkable.[110]  That is, Mr. Porter had "[n]o acute fracture," "[n]ormal alignment," "[n]o spinal stenosis," "[n]o neural foraminal narrowing," and no issues with his soft tissues.[111]  The FCMED physician diagnosed Mr. Porter with a "[c]ontusion of unspecified back wall of thorax [and a] [s]prain of ligaments of [the] cervical spine . . . ."[112]  "A contusion is a deep bruise" and a "cervical sprain is when the tissues . . . that hold the neck bones in place stretch or tear."[113]  Mr. Porter was given a Toradol injection and

---

[103] *Id.* at 18:20–25.

[104] *Id.* at 19:1–7.

[105] *Id.* at 18:20–25, 76:4–13.

[106] *Id.* at 19:1–4.

[107] Def.'s Trial Ex. 1A at 247–48, 250–51; June 6, 2023 Tr. of Bench Trial at 76:14–20.

[108] Def.'s Trial Ex. 1A at 242–45, 251–52; June 6, 2023 Tr. of Bench Trial at 20:16–19, 76:21–77:24.

[109] *See* Pl.'s Trial Ex. 2, Attach. 14; *see also* June 6, 2023 Tr. of Bench Trial at 76:21–77:24.

[110] Def.'s Trial Ex. 1A at 242–45, 251–52; June 6, 2023 Tr. of Bench Trial at 76:21–77:24.

[111] Def.'s Trial Ex. 1A at 242–45, 251–52.

[112] *Id.* at 247, 256; June 6, 2023 Tr. of Bench Trial at 20:22–25.

[113] Pl.'s Trial Ex. 2, Attach. 14.

prescribed Anaprox and Tramadol for pain relief.[114]

43.     The next day, Mr. Porter followed up with the Forrest City medical staff.[115]  He was treated by Nurse Harris.[116]  Although Mr. Porter arrived at the medical unit in a wheelchair, he was "able to stand and walk into [the] exam room and sit in [the] chair without difficulty."[117] He complained of neck, back, shoulder, knee, and ankle pain.[118]  Mr. Porter rated his pain as a 9 out of 10.[119]  However, an examination by Nurse Harris revealed that there was "no obvious swelling," "no bruising," and that Mr. Porter was "able to move all extremities without [a] decrease in [range of motion] . . . ."[120]  Nurse Harris gave Mr. Porter Ibuprofen, prescribed him Naproxen and a wheelchair, gave him a "medical lay in," and instructed him to "refrain from activity" and "rest/ice/heat/elevate areas as needed."[121]  Nurse Harris also placed an order to have an x-ray performed on Mr. Porter's shoulder, knee, and ankle.[122]

44.     The x-rays performed on Mr. Porter's shoulder, knee, and ankle showed that he had no fractures or malalignments.[123]  The x-rays did show a "2mm [enthesophyte] at insertion of the Achilles tendon" and "[m]inimal soft tissue swelling overlying the lateral malleolus."[124]  An

---

[114] Def.'s Trial Ex. 1A at 249, 252–53, 255–56, 260–64; *see* June 6, 2023 Tr. of Bench Trial at 21:4–12.  It is worth noting that Mr. Porter testified that the prison medical staff "gave [him] a shot," not the FCMED medical staff.  June 6, 2023 Tr. of Bench Trial at 18:16–22.  The medical documents admitted at trial, however, unambiguously indicate that Mr. Porter received the Toradol injection at FCMED, not at the prison.  *See* Def.'s Trial Ex. 1A at 249, 220–21.

[115] June 6, 2023 Tr. of Bench Trial at 21:13–17, 77:25–78:2.

[116] *Id.* at 21:18–21; *see id.* at 77:25–78:2; *see also* Def.'s Trial Ex. 1A at 215.

[117] Def.'s Trial Ex. 1A at 215; June 6, 2023 Tr. of Bench Trial at 78:18–22; *see id.* at 22:4–7.

[118] Def.'s Trial Ex. 1A at 215; June 6, 2023 Tr. of Bench Trial at 78:11–17, 87:13–15.

[119] Def.'s Trial Ex. 1A at 215.

[120] *Id.*; June 6, 2023 Tr. of Bench Trial at 78:23–79:5.

[121] Def.'s Trial Ex. 1A at 216; June 6, 2023 Tr. of Bench Trial at 22:10–19, 79:6–14, 87:4–12.

[122] Def.'s Trial Ex. 1A at 216; June 6, 2023 Tr. of Bench Trial at 22:20–21, 79:10–12, 79:24–80:2.

[123] Def.'s Trial Ex. 1A at 210, 212, 268–70; June 6, 2023 Tr. of Bench Trial at 80:4–19.

[124] Def.'s Trial Ex 1A at 210, 212, 268–70; June 6, 2023 Tr. of Bench Trial at 80:4–19.

enthesophyte is a chronic condition that is "[s]imilar to a bone spur . . . ."[125]  It is not a condition

that would immediately occur as the result of a trauma (such as an ankle injury caused by a fall).[126]

45.     On October 30, 2018, Mr. Porter returned to the Forrest City medical unit for

another follow-up.[127]  He again was treated by Nurse Harris.[128]  Mr. Porter complained of pain "in

all the same places" that he rated at a level of 10 out of 10.[129]  However, there was no swelling,

nor tenderness, nor decreased range of motion in Mr. Porter's shoulder, knee, or ankle.[130]  There

was some inflammation in his right ankle.[131]  Nurse Harris prescribed Naproxen, allowed Mr.

Porter to remain in a wheelchair, and requested an MRI of his right ankle.[132]

46.     Despite his pain from the fall, Mr. Porter was able to continue his work as a janitor

in the prison recreational area in October.[133]  That job required Mr. Porter to "spray down sinks,

toilets, and exercise equipment."[134]  He maintained his janitorial job until he was released from

prison.[135]

47.     Additionally, Mr. Porter performed exercises in the prison recreational area at

various points after his fall.[136]  Mr. Porter used the elliptical machine "on occasion" during and

---

[125] June 6, 2023 Tr. of Bench Trial at 80:12–16.

[126] *See id.* (stating that an enthesophyte is a chronic injury).

[127] *Id.* at 22:24–23:3; Def.'s Trial Ex. 1A at 209.

[128] Def.'s Trial Ex. 1A at 209.

[129] *Id.*

[130] *Id.* at 211.

[131] *Id.*; June 6, 2023 Tr. of Bench Trial at 87:16–88:1.

[132] Def.'s Trial Ex. 1A at 210.  The request for an MRI was labeled as "Medically Acceptable-Not Always Necessary." Pl.'s Trial Ex. 2, Attach. 18.2 at 1.  The request was subsequently denied with instructions for Mr. Porter to follow-up with Dr. Sheila Woodard.  *Id.* at 3.

[133] June 6, 2023 Tr. of Bench Trial at 15:2–5, 40:4–8, 40:19–20, 68:9–10.

[134] *Id.* at 40:16–18.

[135] *Id.* at 40:19–24.

[136] *Id.* at 68:11–69:9.

after October of 2018.[137]  He also walked laps on the facility track during that timeframe.[138]  When walking laps, Mr. Porter would sometimes push his wheelchair, but would otherwise not use the wheelchair.[139]

48.     Although Mr. Porter was able to return to work and exercise "on occasion" following his fall, he continued to complain of pain in the months that followed.  On November 16, 2018, Mr. Porter returned to the Forrest City medical unit to again complain about pain.[140]  Mr. Porter described experiencing pain at a level of 10 out of 10 in his neck, back, and right ankle.[141]  This time, Nurse Practitioner Hickerson treated him.[142]  While Mr. Porter arrived at the health unit in a wheelchair, he "ambulated without difficulty to [the] exam room . . . ."[143]  He had normal ranges of motion in his back and ankles.[144]  Nurse Hickerson prescribed Mr. Porter Tylenol and a Medrol dose pack for pain.[145]  A Medrol dose pack is a steroid prescribed for inflammation that causes pain.[146]

49.     At the November 16, 2018 visit, Nurse Hickerson discussed additional pain management medications with Mr. Porter.[147]  Specifically, she discussed Elavil, Duloxetine, and Trazadone.[148]  But Mr. Porter refused these medications because of the "side effects" and because

---

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] *Id.* at 23:23–24:5.

[141] *Id.* at 24:6–8; Def.'s Trial Ex. 1A at 204.

[142] *See* Def.'s Trial Ex. 1A at 203; June 6, 2023 Tr. of Bench Trial at 80:20–24.

[143] Def.'s Trial Ex. 1A at 203.

[144] *Id.* at 205; June 6, 2023 Tr. of Bench Trial at 80:25–81:4.

[145] Def.'s Trial Ex. 1A at 203; June 6, 2023 Tr. of Bench Trial at 24:23–25:1, 81:5–13.

[146] June 6, 2023 Tr. of Bench Trial at 81:5–13.

[147] Def.'s Trial Ex. 1A at 203.

[148] *Id.*

they were, according to him, "psychotic medication[s]."[149]

50.     Mr. Porter's next visit to the Forrest City medical unit occurred on December 12, 2018.[150]  This time, he saw Nurse Harris again.[151]  In his testimony, Mr. Porter stated that, by this time, his shoulder was getting better, but his back, neck, and ankle still hurt.[152]  But here again the medical notes created by Nurse Harris tell another story.  Those notes indicate that Mr. Porter complained of neck, shoulder, and back pain, with no mention of ankle pain and no mention of Mr. Porter's shoulder getting better.[153]  In any event, Nurse Harris's examination (which did not include an ankle examination because Mr. Porter did not complain of ankle pain) did not reveal any swelling, inflammation, tenderness, bruising, or decreased range of motion in Mr. Porter's shoulder, back, or neck.[154]  But because Mr. Porter was still complaining of pain in those areas, Nurse Harris ordered new x-rays and prescribed Naproxen and muscle rub as needed.[155]

51.     The new x-rays were performed on December 18, 2018.[156]  The x-ray results showed no "fracture or malalignment" and were overall "[u]nremarkable."[157]

52.     About two months later, on February 20, 2019, Mr. Porter was seen by Dr. Woodard in the medical unit.[158]  At that visit, Mr. Porter complained of "[u]nrelenting [a]ching pain localized to his [n]eck," "[t]hrobbing" pain in his upper back, and "[t]hrobbing" pain in his ankle.[159]  Dr.

---

[149] June 6, 2023 Tr. of Bench Trial at 24:9–22; Def.'s Trial Ex. 1A at 203.

[150] June 6, 2023 Tr. of Bench Trial at 25:5–12; *see* Def.'s Trial Ex. 1A at 191.

[151] Def.'s Trial Ex. 1A at 191; June 6, 2023 Tr. of Bench Trial at 81:14–17.

[152] June 6, 2023 Tr. of Bench Trial at 25:5–12.

[153] Def.'s Trial Ex. 1A at 191; *see* June 6, 2023 Tr. of Bench Trial at 81:19–22.

[154] Def.'s Trial Ex. 1A at 192–94; June 6, 2023 Tr. of Bench Trial at 81:23–82:20.

[155] Def.'s Trial Ex. 1A at 192; June 6, 2023 Tr. of Bench Trial at 25:13–17, 82:21–25, 88:2–9.

[156] June 6, 2023 Tr. of Bench Trial at 25:22–24; *see* Def.'s Trial Ex. 1A at 226.

[157] Def.'s Trial Ex. 1A at 226–28; June 6, 2023 Tr. of Bench Trial at 25:25–26:10, 82:24–83:15.

[158] Pl.'s Trial Ex. 2, Attach. 19 at 1; June 6, 2023 Tr. of Bench Trial at 26:11–18.

[159] Pl.'s Trial Ex. 2, Attach. 19 at 1.

Woodard prescribed Mr. Porter Tylenol and a TENS unit, and placed a consultation request for an MRI of his ankle because his toes were red and swollen.[160]   (For an unspecified reason, Dr. Woodard's MRI request was "discontinued" on August 20, 2020.)[161]

53.     Mr. Porter's next visit to the medical unit occurred on March 27, 2019.[162]   That visit was a follow-up to the previous pain-management visits.[163]   Mr. Porter complained of "aching" pain in his neck, right knee, and right ankle.[164]   The treating professional, Nurse Harris, did note in her medical notes that "[inmate] is obese . . . ."[165]   She prescribed Mr. Porter Ibuprofen and scheduled a follow-up for him to see a doctor.[166]

54.     Mr. Porter attended the doctor follow-up appointment on April 2, 2019.[167]   He saw Dr. Hari Kapur.[168]   Dr. Kapur discussed chronic pain management with Mr. Porter.[169]

55.     The next month, Mr. Porter saw Nurse Harris to follow-up on "abnormal labs."[170] At that visit, Nurse Harris noted that Mr. Porter parked his wheelchair outside of the office and

---

[160] *Id.* at 1–3; June 6, 2023 Tr. of Bench Trial at 26:25–27:2.  A transcutaneous electrical nerve stimulation (TENS) unit "is a therapy that uses low voltage electrical current to provide pain relief.  A TENS unit consists of a battery-powered device that delivers electrical impulses through electrodes placed on the surface of your skin." *Transcutaneous Electrical Nerve Stimulation (TENS)*, Cleveland Clinic (2020), https://my.clevelandclinic.org/health/treatments/15840-transcutaneous-electrical-nerve-stimulation-tens; *see* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

[161] Pl.'s Trial Ex. 2, Attach. 21; *see* June 6, 2023 Tr. of Bench Trial at 27:7–9.

[162] June 6, 2023 Tr. of Bench Trial at 27:10–14; Pl.'s Trial Ex. 2, Attach. 22 at 1.

[163] June 6, 2023 Tr. of Bench Trial at 27:15–16.

[164] Pl.'s Trial Ex. 2, Attach. 22 at 1.

[165] *Id.*

[166] *Id.*

[167] June 6, 2023 Tr. of Bench Trial at 27:17–22; Pl.'s Trial Ex. 2, Attach. 23 at 1.

[168] Pl.'s Trial Ex. 2, Attach. 23 at 1.

[169] *Id.*

[170] Pl.'s Trial Ex. 2, Attach. 24 at 1.

"ambulate[d] into [the] room and into [the] chair."[171]  Mr. Porter and Nurse Harris discussed diet and exercise with the understanding that Mr. Porter needed "to watch [his] diet."[172]  Mr. Porter weighed in at 279 pounds at that visit.[173]

56.     On June 20, 2019, Mr. Porter saw Dr. Woodard for neck, upper back, and ankle pain.[174]  Mr. Porter rated his pain as a 5 out of 10.[175]  Dr. Woodard's exam revealed nothing abnormal and noted that weather change, sitting, and standing exacerbated Mr. Porter's pain.[176]  Dr. Woodard prescribed Mr. Porter Ibuprofen and a steroid dose pack.[177]

57.     Mr. Porter's next medical unit visit was with Dr. Woodard on August 2, 2019.[178]  Mr. Porter complained of right ankle and lower back pain that he rated as an 8 out of 10.[179]  The exam notes again indicate that weather change exacerbated Mr. Porter's pain.[180]  Dr. Woodard renewed Mr. Porter's Ibuprofen prescription.[181]

58.     Three days later, Mr. Porter followed up with Nurse Harris for abnormal labs.[182]  At that visit, Nurse Harris counseled Mr. Porter on diet, exercise, and weight loss because he weighed in at 270 pounds.[183]  Nurse Harris noted that Mr. Porter arrived at the medical unit in a

---

[171] *Id.*

[172] *Id.*

[173] *Id.* at 2.

[174] Pl.'s Trial Ex. 2, Attach. 26 at 1; June 6, 2023 Tr. of Bench Trial at 27:23–28:3.

[175] Pl.'s Trial Ex. 2, Attach. 26 at 1; June 6, 2023 Tr. of Bench Trial at 28:4–6.

[176] Pl.'s Trial Ex. 2, Attach. 26 at 1–2.

[177] *Id.* at 1.

[178] Pl.'s Trial Ex. 2, Attach. 28 at 1; June 6, 2023 Tr. of Bench Trial at 28:15–18.

[179] Pl.'s Trial Ex. 2, Attach. 28 at 1; June 6, 2023 Tr. of Bench Trial at 28:15–18.

[180] Pl.'s Trial Ex. 2, Attach. 28 at 1.

[181] *Id.* at 3; *see* June 6, 2023 Tr. of Bench Trial at 28:19–21.

[182] Pl.'s Trial Ex. 2, Attach. 29 at 1; June 6, 2023 Tr. of Bench Trial at 28:22–24.

[183] Pl.'s Trial Ex. 2, Attach. 29 at 1–2.

wheelchair but was able to get up and "ambulate into the exam room."[184]  Nurse Harris instructed

Mr. Porter to "continue to work on diet and exercise" and to "take [his] medications as directed."[185]

59.    Mr. Porter's final visit with Dr. Woodard was on October 4, 2019.[186]  At that visit,

Mr. Porter complained of neck, back, ankle, leg, and foot pain "because of the recent

[t]emp[erature] [c]hange."[187]  Mr. Porter denied any recent injury.[188]  After that visit, Mr. Porter

was transferred "from Dr. Woodard's case load to Dr. Tomar's case load . . . ."[189]

60.    Mr. Porter saw Dr. Tomar on March 3, 2020.[190]  At the visit, Dr. Tomar noted that

Mr. Porter was "able to bear weight, but . . . ha[d] opted to largely lead a sedentary life with little

ambulation and no exercise."[191]  Dr. Tomar's "impression [was] that [a] combination of morbid

obesity and deconditioned leg muscles ha[d] resulted in subtle ankle changes followed by chronic

pain."[192]  Dr. Tomar provided Mr. Porter with physical therapy exercises for his ankle, leg, and

neck.[193]  Mr. Porter did not follow through with the physical therapy exercises because they

required resistance bands which were not allowed in the prison housing area and he was not

allowed "time . . . to . . . do the physical therapy in the clinic."[194]

---

[184] *Id.* at 1; June 6, 2023 Tr. of Bench Trial at 28:25–29:7.

[185] Pl.'s Trial Ex. 2, Attach. 29 at 1.

[186] Def.'s Trial Ex. 1A at 285; June 6, 2023 Tr. of Bench Trial at 29:11–18; *see id.* at 83:16–19.

[187] Def.'s Trial Ex. 1A at 285; *see* June 6, 2023 Tr. of Bench Trial at 29:11–18, 83:20–84:1.

[188] Def.'s Trial Ex. 1A at 285; June 6, 2023 Tr. of Bench Trial at 84:2–3.

[189] June 6, 2023 Tr. of Bench Trial at 29:20–30:3.  Dr. Tomar was another medical doctor at Forrest City.  June 6, 2023 Tr. of Bench Trial at 84:20–21.

[190] June 6, 2023 Tr. of Bench Trial at 30:4–9; Def.'s Trial Ex. 1A at 278.

[191] Def.'s Trial Ex. 1A at 278; June 6, 2023 Tr. of Bench Trial at 84:22–85:3.

[192] Def.'s Trial Ex. 1A at 278; *see* June 6, 2023 Tr. of Bench Trial at 30:4–12.

[193] Def.'s Trial Ex. 1A at 278–79; June 6, 2023 Tr. of Bench Trial at 30:19–21, 85:1–3.

[194] June 6, 2023 Tr. of Bench Trial at 30:22–31:7; *see id.* at 85:4–9; *see also* Def.'s Trial Ex. 1A at 278.

61.     Mr. Porter saw Dr. Tomar again on August 20, 2020.[195] Dr. Tomar's notes indicate that Mr. Porter weighed 276 pounds, had "an impressive purchase history for months of junk food," and was "nearly 100 [pounds] overweight . . . ."[196] Dr. Tomar recommended a 10–15 pound weight loss to reduce ankle pain.[197] Dr. Tomar also recommended that Mr. Porter stop spending "hours with [his] neck against the wall [while sitting] on [his] bed" to reduce neck pain.[198]

62.     At Mr. Porter's next medical visit, Dr. Tomar noted that Mr. Porter had made "no meaningful effort to reduce [his] weight . . . ."[199] Mr. Porter testified that he was unable to lose weight because he could not work out due to his injuries.[200]

63.     Sometime around August of 2020, Mr. Porter stopped using a wheelchair.[201] He has not used a wheelchair since leaving prison.[202]

64.     Mr. Porter has not received medical care related to his October 25, 2018 fall since leaving prison.[203]

65.     Mr. Porter still experiences back, neck, and ankle pain.[204] His pain causes him to have trouble sleeping, sitting, and standing.[205] It also affects Mr. Porter's ability to interact with his nine children.[206] Specifically, he is unable to play sports with his kids or chase them around

---

[195] Pl.'s Trial Ex. 2, Attach. 37 at 1; *see* June 6, 2023 Tr. of Bench Trial at 31:13–17.

[196] Pl.'s Trial Ex. 2, Attach. 37 at 1, 3; June 6, 2023 Tr. of Bench Trial at 32:9–11.

[197] Pl.'s Trial Ex. 2, Attach. 37 at 1; *see* June 6, 2023 Tr. of Bench Trial at 32:1–8.

[198] Pl.'s Trial Ex. 2, Attach. 37 at 2.

[199] June 6, 2023 Tr. of Bench Trial at 32:17–33:3.

[200] *Id.*

[201] *See id.* at 33:14–18; Pl.'s Trial Ex. 2, Attach. 37 at 1 ("[Patient] has reduced dependence on [wheelchair].").

[202] June 6, 2023 Tr. of Bench Trial at 33:16–18.

[203] *Id.* at 33:19–25, 41:14–19.

[204] *Id.* at 34:1–15.

[205] *Id.*

[206] *Id.* at 35:4–17.

because he suffers from pain.[207]

66.     Mr. Porter is employed.[208]  He works as a Janitor Supervisor.[209]  That job requires Mr. Porter to supervise three people and help them complete tasks such as sweeping, mopping, and taking out trash.[210]

## CONCLUSIONS OF LAW

"When analyzing actions brought under the FTCA, courts apply the substantive law of the state in which the events giving rise to the complaint occurred."[211]  The alleged tort occurred in Arkansas; so, Arkansas law applies.[212]  The parties agree on that.[213]  Mr. Porter's claim sounds in negligence.[214]  "Negligence is defined as the failure to do something that a reasonably careful person would do, or the doing of something that a reasonably careful person would not do, under the circumstances."[215]  To prevail on a common law claim of negligence in Arkansas, "the plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached the duty, and that the breach was the proximate cause of the plaintiff's injuries."[216]

## I.     Duty

Courts generally begin this analysis by determining whether the defendant owed the

---

[207] *Id.*

[208] *Id.* at 9:16–17, 34:16–18, 40:25–41:5.

[209] *Id.* at 34:16–18, 41:6–7.

[210] *Id.* at 34:19–35:3, 41:8–13.

[211] *Shanner v. United States*, 998 F.3d 822, 824 (8th Cir. 2021).

[212] June 6, 2023 Tr. of Bench Trial at 9:5–9; *see* Compl. (Doc. 2) at 9, 11–12, 16.

[213] *See* June 6, 2023 Tr. of Bench Trial at 46:14–23, 47:5–9, 52:1–6; *see also* Pl.'s Trial Br. (Doc. 73) at 2; Def.'s Trial Br. (Doc. 75) at 3.

[214] *See* Compl. (Doc. 2) at 13.

[215] *Ethyl Corp. v. Johnson*, 345 Ark. 476, 481, 49 S.W.3d 644, 648 (2001).

[216] *Duran v. Sw. Ark. Elec. Coop. Corp.*, 2018 Ark. 33, at 6, 537 S.W.3d 722, 726.

plaintiff a duty, and, if so, the scope of that duty.[217]   In Arkansas, as in all or nearly all states, a

property owner's duty depends on the status of the other party who is on the property.[218]  Currently,

the highest order of duty for property owners is the duty they have vis-à-vis invitees.[219] And this

is the category that both parties in this case suggest applies to Mr. Porter.[220]  So the Court will treat

Mr. Porter as an invitee.[221]  "In Arkansas, a property owner has a duty to exercise ordinary care to

maintain the premises in a reasonably safe condition for the benefit of invitees."[222]

Importantly, however, this duty usually "applies only to defects or conditions such as

hidden dangers, traps, snares, pitfalls and the like, in that they are known to the owner but not to

---

[217] "The issue of whether a duty exists is always a question of law, not to be decided by a trier of fact."  *Lacy v. Flake & Kelley Mgmt., Inc.*, 366 Ark. 365, 367, 235 S.W.3d 894, 896 (2006).  However, it is often necessary for a trier of fact to resolve predicate disputed factual issues before the Court can decide the legal question concerning duty.  *See Elkins v. Arkla, Inc.*, 312 Ark. 280, 281, 849 S.W.2d 489, 490 (1993).  In the case at bar, the Court and trier of fact are one in the same.  Now that the "trier of fact" has settled the predicate factual disputes, "the Court" can reach a conclusion on the legal duty question.

[218] *See Roeder v. United States*, 2014 Ark. 156, at 10 n.6, 432 S.W.3d 627, 634 n.6.

[219] *See Coleman v. United Fence Co.*, 282 Ark. 344, 345, 668 S.W.2d 536, 537 (1984) ("The general rule is that the possessor of land is not liable for injury to trespassers caused by his failure to exercise reasonable care to put his land in a safe condition for them."); *King v. Jackson*, 302 Ark. 540, 541, 790 S.W.2d 904, 905 (1990) ("Generally, a landowner owes no duty to a licensee other than to refrain from injuring her through willful or wanton conduct."); *infra* note 222 and accompanying text.  An "invitee" is "one who enters or remains on land for a purpose connected with the business dealings of the owner."  *Young v. Paxton*, 316 Ark. 655, 660, 873 S.W.2d 546, 549 (1994).

[220] June 6, 2023 Tr. of Bench Trial at 46:12–23 ("Ms. Lorence: . . . The plaintiff here, a then incarcerated person, while perhaps not totally hitting on all cylinders with respect to a true state analog, Arkansas courts have likened an inmate with the legal status of an invitee."); *id.* at 51:18–23 ("Mr. Proctor: . . . In this case, he's there not by choice, so he's clearly under the law an invitee.").

[221] The Court wonders whether prison inmates—who are not in the prison voluntarily—should receive some higher order of protection under common law.  But that academic query is of no moment here because neither party argues for such a novel approach.  In any event, it is true that "because a 'prisoner has involuntarily entrusted himself to the control and protection of the prison' and is not free to leave to seek safer conditions, [some] courts have agreed that prisoners should be given invitee status."  *Williams v. United States*, 2:15CV00123, 2017 WL 1078655, at *4 n.10 (E.D. Ark. Feb. 17, 2017) (citations omitted) (collecting cases).  Most courts generally acknowledge the awkwardness of the designation, but note that the invitee category is the highest level of protection available.  *See Carson v. Corrs. Corp. of Am.*, 10-cv-01329, 2011 WL 1656509, at *3 (D. Colo. May 3, 2011) ("Although a prisoner is perhaps not the most typical example, plaintiff's circumstances are most closely analogous to that of an invitee."); *Dubuis v. United States*, 3:06CV01443, 2008 WL 410429, at *4 (D. Conn. Feb. 12, 2008) (assuming that the federal inmate "was owed the highest duty of care, that of an invitee").

[222] *Dollar Gen. Corp. v. Elder*, 2020 Ark. 208, at 7, 600 S.W.3d 597, 603.

the invitee and would not be observed by the latter in the exercise of ordinary care."[223]  Put another way, a landowner "generally does not owe a duty to an invitee if a danger is known or obvious."[224] "A dangerous condition is 'obvious' when 'both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising ordinary perception, intelligence, and judgment.'"[225]  "A dangerous condition is 'known' if the plaintiff had knowledge of the existence of [the] dangerous condition and appreciated the corresponding danger."[226]  This rule is colloquially known as the obvious-danger rule or the open-and-obvious rule.[227]

Both parties agree that the hole in Shower 8 constituted an open-and-obvious hazard.[228] Both parties further agree that Mr. Porter knew of the hazard and the dangers associated with it.[229] In most cases, that would be the end of the matter.  But, here, Mr. Porter asserts that this case fits into an exception to the open-and-obvious rule.  The Arkansas Supreme Court has "described the . . . exception to apply 'when the invitee is forced, as a practical matter, to encounter that danger in order to perform his or her job.'"[230]  Mr. Porter argues that, as a practical matter, he was forced to use Shower 8—because it was the only one with hot water in the A-1 Unit.[231]  Putting aside (for a moment) whether the exception set forth by the Arkansas Supreme Court is limited to workers

---

[223] *Id.*

[224] *Id.*

[225] *Shook v. Love's Travel Stops & Country Stores, Inc.*, 2017 Ark. App. 666, at 7, 536 S.W.3d 635, 639 (quoting *Van DeVeer v. RTJ, Inc.*, 81 Ark. App. 379, 386, 101 S.W.3d 881, 885 (2003)).

[226] *Rogers v. Dep't of Veterans Affairs USA*, 1:19-cv-00041, 2021 WL 304557, at *5 (E.D. Ark. Jan. 29, 2021) (citing *Hope Med. Park Hosp. v. Varner*, 2019 Ark. App. 82, at 6, 568 S.W.3d 818, 823).

[227] *See Jenkins v. Int'l Paper Co.*, 318 Ark. 663, 670–71, 887 S.W.2d 300, 303–04 (1994); *Shook*, 2017 Ark. App. 666, at 2, 536 S.W.3d at 637.

[228] June 6, 2023 Tr. of Bench Trial at 52:10–15; *see id.* at 46:14–47:9.

[229] *Id.* at 47:3, 52:16–18.

[230] *Pinson v. 45 Dev., LLC*, 758 F.3d 948, 952 (8th Cir. 2014) (quoting *Jenkins*, 318 Ark. at 670, 887 S.W.2d at 304).

[231] June 6, 2023 Tr. of Bench Trial at 52:6–22, 54:19–55:5.

forced to encounter an obvious danger, Mr. Porter's position runs headlong into the Court's findings of fact. The Court has found as a factual matter that Shower 8 was not the only A-1 Unit shower with hot water.[232] Accordingly, Mr. Porter was not forced, as a practical matter, to use Shower 8.

Mr. Porter has one final argument. He asserts that Arkansas recognizes an exception to the open-and-obvious rule even where an invitee is not forced to encounter the hazard.[233] Specifically, he says that the exception applies when a defendant should reasonably anticipate that harm to an invitee may arise notwithstanding the open-and-obvious danger.[234] And, here, the BOP should have anticipated that (1) inmates would use Shower 8 despite knowing about the hole, and (2) that at least one inmate would accidentally step in the hole while showering.[235]

The Court wishes to be clear: This broader exception, if taken seriously, would threaten to swallow the open-and-obvious rule. If this Court's job was to decide what the common law should be in Arkansas in this area, the Court would reject this broader exception. But that is decidedly not this Court's job. In this FTCA case, just as in diversity cases, the Court's job is to apply Arkansas law as set forth by the Arkansas Supreme Court.[236] And where the Arkansas Supreme Court has not yet clearly resolved an issue, this Court's job is to make an educated prediction as to what the Arkansas Supreme Court would do were it faced with the issue.[237] As disconcerting as it might be to me, all the normal clues that usually aid federal courts in this educated prediction

---

[232] *See supra* Findings of Fact ¶ 22.

[233] June 6, 2023 Tr. of Bench Trial at 95:8–96:14.

[234] *Id.* at 95:16–96:1.

[235] *Id.* at 96:2–14.

[236] *LaFromboise v. Leavitt*, 439 F.3d 792, 793 (8th Cir. 2006); *Safeco Ins. Co. of Ill. v. Palazzolo*, 15 F.4th 1204, 1206 (8th Cir. 2021).

[237] *See Interstate Bakeries Corp. v. OneBeacon Ins. Co.*, 686 F.3d 539, 542 (8th Cir. 2012).

point towards application of this broader exception.

Perhaps most importantly—given my role as an inferior federal court—the Eighth Circuit seems to believe the Arkansas Supreme Court would apply the broader exception Mr. Porter advocates.  In *Pinson v. 45 Development, LLC*, the Eighth Circuit noted that the Arkansas Supreme Court has, at least once, "referred to the Restatement's broader formulation of the obvious danger rule exception: that it applies when a landowner 'as a reasonable person should anticipate an unreasonable risk of harm to the invitee notwithstanding his knowledge, warning, or the obvious nature of the condition.'"[238]  And, indeed, in that diversity case under Arkansas state law, the Eighth Circuit went on to apply the broader version of the exception.[239]

The Eighth Circuit is not the only Court to conclude that Arkansas law countenances the broader version of the exception.  The Arkansas Court of Appeals has come to the same conclusion.  In *Van DeVeer v. RTJ, Inc.*, while acknowledging that the Arkansas Supreme Court has thus far only applied an exception to the open-and-obvious rule in forced-to-encounter scenarios, the Arkansas Court of Appeals adopted the broader exception.[240]  Despite concluding the harm in its case was "known or obvious" and the invitee was not "forced to encounter" that harm, the *Van DeVeer* Court reversed a summary judgment grant because "reasonable men could reach different conclusions as to whether [a landowner] should have anticipated that harm to its invitee might arise under the circumstances . . . ."[241]

---

[238] 758 F.3d at 952 (quoting *Jenkins*, 318 Ark. at 670, 887 S.W.2d at 304).

[239] *Id.*  Technically, because the Eighth Circuit held that the landowner was not liable even under the broader exception formulation, the Eighth Circuit's view that the broader exception applies is not a binding holding.  Additionally, *Pinson* concerned an independent contractor performing a job, so it did not have to address whether the exception applies to invitees that are not performing a job.  *Id.* at 953.

[240] 81 Ark. App. at 389–90, 101 S.W.3d at 886–87.

[241] *Id.*  To be sure, cases decided by the Arkansas Court of Appeals are not binding on me as definitive expositions of the law in Arkansas.  *See United Fire & Cas. Ins. Co. v. Garvey*, 328 F.3d 411, 413 (8th Cir. 2003).  However, such

As support for the existence of the broader exception in Arkansas common law, the Arkansas Court of Appeals relied heavily on the Arkansas Model Jury Instructions (AMI) and the Restatement (Second) of Torts.[242]  The reliance on these sources makes a good deal of sense.  The Arkansas Model Jury Instructions are expressly adopted by the Arkansas Supreme Court, and thus the content of the relevant Instruction would be a good indicator of how the Arkansas Supreme Court views the overall doctrine.[243]  As for the Restatement (Second) of Torts, the Arkansas Supreme Court positively adverted to it in the Court's 1974 landmark case concerning the exception to the open-and-obvious rule:

> The duties of owners and occupiers of land to business invitees usually end when the danger is either known or obvious to the invitee.  However, most authorities; see Prosser on Torts, Invitee s 61 (4th ed. 1971); 2 Harper and James, The Law of Torts s 27.13 (1956); and Restatement of Torts 2d s 343A (1965); recognize that under some circumstances a possessor of land may owe a duty to the business invitee despite the knowledge of the latter.[244]

As discussed below, these two sources—the Arkansas Model Jury Instructions and the Restatement (Second) of Torts—pretty clearly point to the broader exception.

AMI 1104 reads: "[The landowner] owed [to the invitee] a duty to use ordinary care to maintain the premises in a reasonably safe condition.  No such duty exists, however, if the . . . condition of the premises that creates the danger was known by or obvious to [the invitee,] unless [the landowner] should reasonably anticipate that [the invitee] would be exposed to the danger

---

cases are often persuasive insofar as they suggest what the Arkansas Supreme Court would do if confronted with the same question.  *See id.*

[242] *Van DeVeer*, 81 Ark. App. at 389, 101 S.W.3d at 886–87.

[243] *See Cont'l S. Lines, Inc. v. Moses*, 239 Ark. 905, 907, 395 S.W.2d 20, 22 (1965) ("The subjects of both instructions are now covered by our recently adopted Arkansas Model Jury Instructions [AMI]." (brackets in original)); *Reed v. State*, 2020 Ark. App. 49, at 5, 595 S.W.3d 391, 394 ("[O]ur supreme court has adopted model jury instructions for circuit courts to use in civil and criminal cases."); 2 Ark. Civ. Prac. & Proc. § 28:19 (5th ed.).

[244] *Kuykendall v. Newgent*, 255 Ark. 945, 947, 504 S.W.2d 344, 345 (1974).

despite [his or her] knowledge of it, or its obvious nature."[245]  The exception to the open-and-
obvious rule set forth in the final clause of this instruction is far closer to the broader version of
the exception than it is to the narrow version.[246]  The same is true of Section 343A of the
Restatement (Second) of Torts, which states that "[a] possessor of land is not liable to his invitees
for physical harm caused to them by any activity or condition on the land whose danger is known
or obvious to them, unless the possessor should anticipate the harm despite such knowledge or
obviousness."[247]

      To the extent there is some doubt about the actual breadth of these formulations of the
exception, the relevant Restatement Comment and Illustrations suggest a broad meaning was
intended.  The Comment explains:

> There are, however, cases in which the possessor of land can and should anticipate
> that the dangerous condition will cause physical harm to the invitee notwithstanding
> its known or obvious danger.  In such cases the possessor is not relieved of the duty
> of reasonable care which he owes to the invitee for his protection.  This duty may
> require him to warn the invitee, or to take other reasonable steps to protect him,
> against the known or obvious condition or activity, if the possessor has reason to

---

[245] AMI Civ. 1104 (2022) (cleaned up).

[246] Indeed, the AMI's Note on Use and accompanying Comment bear this out.  The Note on Use explains that "[f]or
instances where the last [clause] . . . is appropriate, see cases cited in the Comment."  The referenced Comment
expressly mentions in case parentheticals the forced-to-encounter scenario, but then goes out of its way to add that
"[o]ther exceptions to the obvious danger rule are discussed in the authorities cited in *Jenkins* . . . and *Kuykendall* . . .
."  The Court has already discussed *Kuykendall*'s reference to the Restatement (Second) of Torts.  *See supra* note 244
and accompanying text.  In addition, both *Kuykendall* and *Jenkins* quote extensively from Prosser.  The Prosser quotes
from those cases—separated by two decades—are slight variations on the same theme, but essentially explain:

> In any case where the occupier as a reasonable person should anticipate an unreasonable risk of
> harm to the invitee notwithstanding his knowledge, warning, or the obvious nature of the condition,
> something more in the way of precautions may be required.  This is true, for example, where there
> is reason to expect that the invitee's attention will be distracted, as by goods on display, or that after
> a lapse of time he may forget the existence of the condition, even though he has discovered it or
> been warned; or where the condition is one which would not reasonably be expected, and for some
> reason, such as an arm full of bundles, it may be anticipated that the visitor will not be looking for
> it.  In some jurisdictions, it is also true where the condition is one, such as icy steps, which cannot
> be negotiated with reasonable safety even though the invitee is fully aware of it, when, because the
> premises are held open to him for his use, it is to be expected that he will nevertheless proceed to
> encounter it.

*Jenkins*, 318 Ark. at 671, 887 S.W.2d at 304; *Kuykendall*, 255 Ark. at 948, 504 S.W.2d at 345–46.

[247] Restatement (Second) of Torts § 343A(1) (Am. Law Inst. 1965).

expect that the invitee will nevertheless suffer physical harm.

> Such reason to expect harm to the visitor from known or obvious dangers may arise, for example, where the possessor has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it.  Such reason may also arise where the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.[248]

And the Illustrations provided in the Restatement drive home the point.

> The A Department Store has a weighing scale protruding into one of its aisles, which is visible and quite obvious to anyone who looks.  Behind and about the scale it displays goods to attract customers.  B, a customer, passing through the aisle, is intent on looking at the displayed goods.  B does not discover the scale, stumbles over it, and is injured.  A is subject to liability to B.

> The A Drug Store has a soda fountain on a platform raised six inches above the floor.  The condition is visible and quite obvious.  B, a customer, discovers the condition when she ascends the platform and sits down on a stool to buy some ice cream.  When she has finished, she forgets the condition, misses her step, falls, and is injured.  If it is found that this could reasonably be anticipated by A, A is subject to liability to B.

> Through the negligence of A Grocery Store a fallen rainspout is permitted to lie across a footpath alongside the store, which is used by customers as an exit.  B, a customer, leaves the store with her arms full of bundles which obstruct her vision, and does not see the spout.  She trips over it, and is injured.  If it is found that A should reasonably have anticipated this, A is subject to liability to B.

> A owns an office building, in which he rents an office for business purposes to B. The only approach to the office is over a slippery waxed stairway, whose condition is visible and quite obvious.  C, employed by B in the office, uses the stairway on her way to work, slips on it, and is injured.  Her only alternative to taking the risk was to forgo her employment.  A is subject to liability to C.[249]

It seems, then, that Arkansas has or would adopt the following common law rule with respect to open-and-obvious hazards.  An invitee—whether on a particular premises to perform work, to shop, to serve a prison sentence, or to do any of the myriad of things an invitee might do—is owed

---

[248] *Id.* § 343A cmt. f.

[249] *Id.* § 343A illus. 2–5.

a duty of care by a landowner when that landowner should reasonably anticipate that, because of some undefined list of special circumstances, the invitee will be harmed as a result of a hazard that is obvious and even known by the invitee.

Under this version of the exception, Mr. Porter is right that the United States had a duty of care to Mr. Porter. While the danger of the hole in the shower was open and obvious—indeed it was specifically known to Mr. Porter—BOP officials should have, on October 25, 2018, reasonably anticipated that an inmate would be harmed by it.[250] BOP officials must have known inmates were using the shower despite the hole. Indeed, Mr. Porter, other inmates, and a BOP official complained on multiple occasions about the hole in the shower.[251] Moreover, as Mr. Porter testified, he used Shower 8 nearly every day and a lot of other inmates used Shower 8 as well.[252] It is reasonable to infer that BOP officials saw inmates using Shower 8 well after they knew that there was a hole in the shower. The harder question is whether BOP officials should have anticipated that an inmate would step in the hole despite knowing about it.

Given the location of the shower head, the hole was exactly on (or incredibly close to) the only spot where an inmate could stand to effectively take a shower.[253] To avoid the hole and still shower, one would have to straddle the hole or stand incredibly close to its edges. Showers involve water and soap—on one's face, near one's eyes, and on the floor. Any reasonable landowner would anticipate that one of the inmates using that shower would at some point get water or soap in his eyes, slip on a wet floor, and/or otherwise become distracted and accidentally step into the hole—even despite knowing it was there at the beginning of his shower. This is enough to trigger

---

[250] *See supra* Findings of Fact ¶¶ 8–9.

[251] *See supra* Findings of Fact ¶¶ 8–9.

[252] *See supra* Findings of Fact ¶¶ 8, 16.

[253] *See supra* pp. 4–5.

the broad exception to the open-and-obvious rule.[254]

## II.   Breach

The United States breached its duty of care.   BOP officials were aware of the hole in Shower 8 for months before Mr. Porter's fall.[255]   They did not fix the hole.   They did not shut off the water in the shower.   They did not lock the shower door.   They did not post warnings outside or inside the shower.   They did not tell inmates not to use that shower.   Essentially, they did nothing.   This was a breach of the duty owed by the United States to Mr. Porter.

## III.   Proximately Caused Injury and Damages

"Proximate causation is an essential element for a cause of action in negligence."[256]   That is, as part of the liability case, the plaintiff must prove an injury that was proximately caused by the negligent event.   "Proximate cause means a cause, which, in a natural and continuous sequence, produces damage and without which the damage would not have occurred."[257]   Proximate cause requires "causation in fact and legal causation."[258]   Causation in fact "addresses whether, as a matter of fact, an injury followed from a particular action."[259]   In other words, "to constitute a cause in fact, the defendant's negligent act must be a necessary cause of the plaintiff's injury, such

---

[254] The Court has already emphasized its serious concerns with the breadth of this exception.  *See supra* pp. 28–29. However, it is fair to note that, if the broad exception has purchase in any circumstances, it has purchase here where the "invitee" is a prisoner being forced to be on the landowner's property.  Not forced in the practical sense, but in the real sense of the word.  *Cf.* Restatement (Second) of Torts § 343A(2) (Am. Law Inst. 1965) ("In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated."); *id.* § 343A cmt. g.

[255] *See supra* Findings of Fact ¶ 9.

[256] *Clark v. Ridgeway*, 323 Ark. 378, 389, 914 S.W.2d 745, 750 (1996).

[257] *Schubert v. Target Stores, Inc.*, 2010 Ark. 466, at 4, 369 S.W.3d 717, 719.

[258] *Chambers v. Stern*, 347 Ark. 395, 406, 64 S.W.3d 737, 744 (2002) (quoting *Dodson v. Charter Behavioral Health Sys. of Nw. Ark., Inc.*, 335 Ark. 96, 105, 983 S.W.2d 98, 103 (1998)); *see Peregrine Trading, LLC v. Rowe*, 2018 Ark. App. 176, at 17, 546 S.W.3d 518, 529 (stating that an essential element of negligence is "injury to the plaintiff actually and proximately caused by the defendant's breach").

[259] *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 667 (8th Cir. 2009).

that without the negligent act, the plaintiff would not have suffered the injury."[260]  Legal cause, on the other hand, is often "presented in terms of foreseeability."[261]  Specifically, negligence is the legal cause of an injury if the injury "ought to have been foreseen in the light of attending circumstances."[262]

Once a liability case is proven, the next question is one of damages.  In Arkansas, the measure of damages in a negligence case is "the amount of money which will reasonably and fairly compensate" the plaintiff for "[a]ny pain and suffering and mental anguish experienced in the past and reasonably certain to be experienced in the future" that was "proximately caused by the" defendant's negligence.[263]  "There is no definite and satisfactory rule to measure compensation for pain and suffering and the amount of damages must depend on the circumstances of each particular case."[264]

The Court concludes that the October 25, 2018 fall (which was the result of a negligent breach of duty by the United States) was the proximate cause of some injury to Mr. Porter.  As stated above, the United States breached its duty when it failed to repair the hole in Shower 8.[265] That hole foreseeably caused Mr. Porter to fall when he stepped in it while taking a shower.[266] And Mr. Porter's fall foreseeably caused him some degree of injury in the form of pain, suffering,

---

[260] 1 Ark. Law of Damages § 33.1 (West Nov. 2022).

[261] *Id.*

[262] *Regions Bank & Trust v. Stone Cnty. Skilled Nursing Facility, Inc.*, 345 Ark. 555, 568, 49 S.W.3d 107, 116 (2001).

[263] AMI Civ. 2201, 2205 (2022) (brackets and italics omitted).

[264] *Hamby v. Haskins*, 275 Ark. 385, 390, 630 S.W.2d 37, 40 (1982); *see Townsend v. Bayer Corp.*, 774 F.3d 446, 466 (8th Cir. 2014) ("In general, awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms." (citation and internal quotation marks omitted)).

[265] *See supra* p. 34.

[266] *See supra* Findings of Fact ¶ 10.

and mental anguish.[267]   Mr. Porter's pain caused by the fall is evidenced by his testimony and the medical treatment he received immediately following the fall.   The fall caused Mr. Porter pain in his ankle, shoulder, elbow, neck, and back.[268]   The pain was such that—at least immediately following the fall—Mr. Porter was unable to walk to the Forrest City medical unit.[269]   He rated his pain as a 10 out of 10 immediately after the fall.[270]   The Forrest City medical unit prescribed Mr. Porter medication to treat his pain.[271]   Additionally, the night of Mr. Porter's fall, he was taken to the Forrest City Medical Center Emergency Department for increasing pain.[272]   There, he was diagnosed with a contusion and a cervical sprain.[273]   Mr. Porter continues to experience pain.[274] A fall that results in pain, suffering, and mental anguish is a foreseeable consequence of failing to repair a hole in a shower that is regularly used.[275]

With respect to damages, Mr. Porter seeks compensation only for pain, suffering, and mental anguish.[276]   He believes that $60,000 "would be . . . fair compensation" in this case.[277]   Mr. Porter reaches his $60,000 figure by using the extent of his medical treatment as a proxy, which he estimates would "easily" be in the $10,000 to $20,000 range.[278]   The evidence in this case,

---

[267] *See supra* Findings of Fact ¶¶ 10, 38–41.

[268] *See supra* Findings of Fact ¶¶ 38–39.

[269] *See supra* Findings of Fact ¶¶ 38–39.

[270] *See supra* Findings of Fact ¶ 39.

[271] *See supra* Findings of Fact ¶ 39.

[272] *See supra* Findings of Fact ¶ 40.

[273] *See supra* Findings of Fact ¶ 42.

[274] *See supra* Findings of Fact ¶ 65.

[275] *Cf. Fayetteville Diagnostic Clinic, Ltd. v. Turner*, 344 Ark. 490, 499–500, 42 S.W.3d 420, 426 (2001) (affirming jury verdict awarding damages for pain and suffering as the result of a slip-and-fall).

[276] June 6, 2023 Tr. of Bench Trial at 36:8–10, 37:16–17.   Mr. Porter explicitly stated at trial that he is not seeking damages for medical expenses, lost wages, or loss of earning capacity.   *Id.* at 35:18–36:7.

[277] *Id.* at 97:3–5.

[278] *Id.* at 97:6–16.

however, suggests a far lower amount is sufficient to reasonably and fairly compensate Mr. Porter.

To start, Mr. Porter experienced serious pain (in his back, shoulder, and leg) long before he fell in Shower 8.[279]  He regularly rated his pre-fall pain as 8 or 9 out of 10 in severity.[280]  So, there is strong evidence that Mr. Porter would have experienced severe pain in the exact same portions of his body even if he hadn't fallen.  Second, the fall in Shower 8 did not cause Mr. Porter any permanent injury (aside from some lingering pain) or significantly impair his ability to move around and exercise.  He was diagnosed with a contusion in his back and a sprain in his neck, both of which were treatable with pain medication, ice, muscle rub, and rest.[281]  And although Mr. Porter opted to use a wheelchair most of the time, he was able to ambulate without it.[282]  Indeed, Mr. Porter was able to use the elliptical machine and walk the track at Forrest City.[283]  And, after leaving prison, he has not used a wheelchair at all.[284]

To be sure, the fall in Shower 8 caused Mr. Porter some pain, suffering, and mental anguish that he would not have otherwise experienced—particularly, pain, suffering, and mental anguish that occurred in the immediate aftermath of the fall.  Mr. Porter deserves compensation for that short-term pain, suffering, and mental anguish.  But the vast majority of the long-term pain, suffering, and mental anguish he reports is not causally related to the fall.  Before the fall, Mr. Porter was already experiencing long-term pain, suffering, and mental anguish due to past injuries

---

[279] *See supra* Findings of Fact ¶¶ 24–37.

[280] *See supra* Findings of Fact ¶¶ 31–35, 37.

[281] *See supra* Findings of Fact ¶¶ 42–43.

[282] *See supra* Findings of Fact ¶¶ 43, 48, 55, 58.

[283] *See supra* Findings of Fact ¶ 47.

[284] *See supra* Findings of Fact ¶ 63.  Moreover, some portion of Mr. Porter's pain (including any ankle pain) is attributable to his obesity.  As outlined in the Court's factual findings, the Forrest City medical personnel repeatedly discussed Mr. Porter's weight, nutrition, and exercise habits with him.  *See supra* Findings of Fact ¶¶ 29, 32–33, 53, 55, 58, 60–62.  Doctors and nurses told Mr. Porter on multiple occasions that his weight contributed to his pain and that lifestyle change would be the best treatment.  *See supra* Findings of Fact ¶¶ 29, 32–33, 53, 55, 58, 60–62.  Yet, Mr. Porter did not and has not acted on that advice.  *See supra* Findings of Fact ¶ 31.

and lifestyle choices.  To the extent the fall exacerbated this long-term pain, suffering, and mental anguish, it mostly did so temporarily, and any permanent exacerbation was marginal.  Put another way, by a preponderance of the evidence, Mr. Porter would have experienced nearly the same (but not entirely the same) level of long-term pain, suffering, and mental anguish even if there had been no fall.

Damages in this case cannot be based on that vast majority of long-term pain, suffering, and mental anguish.  It can only be based on the pain, suffering, and mental anguish that Mr. Porter experienced (and experiences) because of the fall.  The Court concludes that $2,500 reasonably and fairly compensates Mr. Porter for the pain, suffering, and mental anguish that he suffered from the fall in Shower 8.  Most of this figure is tied to the pain, suffering, and mental anguish Mr. Porter suffered immediately after the fall, but a small amount is tied to the very marginal long-term pain, suffering, and mental anguish attributable to the fall.[285]

## CONCLUSION

In accordance with the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED that judgment shall be entered in favor of Plaintiff Damon Dewayne Porter in the amount of $2,500.[286]  Before a final judgment in this case is entered, however, the Court must resolve the *Bivens* claims that (technically) are still a part of this case.  At the bench trial, the parties seemed to agree that, no matter how the FTCA claims came out, their resolution would

---

[285] As noted above in footnote 276, Mr. Porter does not seek damages for past medical expenses (which were paid for by the prison system), lost wages, or lost earning capacity.  Moreover, he does not seek damages for future medical expenses, lost wages, or lost earning capacity.  And that is something of import: Mr. Porter appears to believe he does not need any future medical treatments for injuries from this fall, and he does not believe the injuries from this fall are going to affect his work.  In this context, it is hard to imagine that Mr. Porter's pain, suffering, and mental anguish are anywhere close to as extensive as he suggests.

[286] Mr. Porter also asks for his filing fee.  June 6, 2023 Tr. of Bench Trial at 37:13–15.  But that is not an appropriate damages category.  It may, however, be an appropriate request for a post-judgment fees and costs motion.

prevent subsequent litigation of the *Bivens* claims pursuant to 28 U.S.C. § 2676.[287]  Within seven

days of the date of this Order, the Court directs the parties to file a joint submission explaining (1)

whether each party still takes this position and (2) if so, what the appropriate disposition of those

*Bivens* claims should be (e.g., dismissal with prejudice, dismissal without prejudice, judgment in

favor of one side or the other, or some other disposition).

IT IS SO ORDERED this 24th day of July 2023.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[287] *Id.* at 110:4–111:24.  The bench trial concerned one of Mr. Porter's FTCA claims.  *Id.* at 3:18–4:10.  The other FTCA claim was resolved by way of a motion for summary judgment.  Order (Doc. 65).